UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN M. HACKETT, | ) | Civ. 06-5040-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER GRANTING |
| vs. | ) | STANDARD'S MOTION |
| | ) | FOR SUMMARY JUDGMENT |
| STANDARD INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Kathleen M. Hackett, has filed suit against defendant,

Standard Insurance Company (Standard), under 29 U.S.C. § 1132(a) asserting

that Standard violated the provisions of the Employee Retirement Security Act

of 1974 (ERISA) by wrongfully denying Hackett's claim for disability benefits.

Both parties move for summary judgment.  Standard's motion for summary

judgment is granted.

## FACTUAL BACKGROUND

Hackett was an employee of Mileage Plus Inc. (MPI) in Rapid City, South

Dakota, for fourteen years, eventually serving as a Customer Service

Supervisor.  As a benefit of her employment at MPI, she received disability

insurance under a benefit plan (Plan) issued by Standard.  Neither party

disputes that the Plan is governed by ERISA.

As is relevant to this case, the Plan has two separate disability periods.

The Plan provides disability benefits for the first 24 months after the onset of

a disability if the insured is unable to work at his or her "own occupation." To

continue to receive benefits after the first 24 months, the insured must

demonstrate an inability to work at "any occupation" as defined by the Plan.

With regard to "any occupation" benefit eligibility, the Plan states:

> During the Any Occupation Period you are required to be
> Disabled from all occupations.
>
> You are disabled from all occupations if, as a result of Sickness,
> Injury or Pregnancy, you are unable to perform with reasonable
> continuity the material duties of any gainful occupation for
> which you are reasonably fitted by education, training and
> experience.

A.R. 16.

Standard determined that a position paying wages of $2600 per month

or greater would qualify as a gainful occupation considering Hackett's

experience and abilities.  A.R. 150.

Hackett asserts that she is disabled as a result of the lingering effects of

a brain hemorrhage she suffered on September 28, 2002.  On that day,

Hackett was taken to the hospital where she was seen by a neurologist,

Dr. James Nabwangu, and she underwent emergency surgery.  AR 245.

Hackett was released from the hospital eleven days after the surgery, but

continued to see Dr. Nabwangu.  A.R. 244.

On November 5, 2002, Dr. Nabwangu noted that Hackett had "done

exceptionally well" since the surgery.  A.R. 236.  Hackett reported to

Dr. Nabwangu that she was planning on returning to work part time at MPI,

2

beginning November 7, 2002. A.R. 236. On December 3, 2002, Hackett again saw Dr. Nabwangu. A.R. 237. During that visit, Hackett reported that her ability to focus was improving, and that she was able to do computer work when she was not distracted. A.R. 237. Hackett also reported that she was extremely tired after seven hours of work. A.R. 237. Dr. Nabwangu noted that he wanted Hackett to remain working 30 hours a week, and he was amenable to her resuming driving. A.R. 237.

After returning to MPI, Hackett continued to receive medical treatment. Hackett's internist, Dr. James Bowman, saw her in early 2003. Dr. Bowman noted that Hackett was "doing very well" and had more energy, but did note that she had suffered a slight headache earlier in the day. A.R. 462. On January 15, 2003, Hackett reported to Dr. Bowman that she was suffering from a severe headache, which she reported was worse when she did "work on the computer with numbers." A.R. 464. After a visit with Dr. Bowman on March 21, 2003, Dr. Bowman noted that Hackett had "a lot of mood lability" and was unable to focus at her job. Dr. Bowman noted that she had not had problems with severe headaches. A.R. 467. On April 21, 2003, Dr. Bowman noted that Hackett still suffered from "occasional" headaches but that her mood had improved. A.R. 469.

On February 28, 2003, Hackett applied to Standard for "own occupation" disability benefits, asserting that the effects of the hemorrhage

3

rendered her unable to perform her duties as a customer service provider.  On May 1, 2003, Standard informed Hackett that it had approved her disability claim from December 26, 2002,[1] until January 17, 2003, but found that after January 17, 2003, she could return to work.  A.R. 260-62.

On May 6, 2003, Hackett ended her employment with MPI.  She visited Dr. Nabwangu that day, and he noted that Hackett "had to quit her job today, because she is really unable to handle the duties demanded of her, due to intellectual impairment of some confusion; etc."  A.R. 307.

On June 17, 2003, Hackett was readmitted to the hospital after feeling "confused" while working as a receptionist.  A.R. 372.  She was diagnosed with cerebral ischemia, and discharged after three days of treatment, with plans for physical and occupational therapy and home medication.  A.R. 370-74. Hackett was discharged from her part-time receptionist job because her employer told her they needed someone who could be there every day.  A.R. 605.

Hackett appealed Standard's initial determination that she could return to work effective January 17, 2003, and submitted a report from Dr. Nabwangu made after the May 6, 2003, visit which stated as follows:

> I do genuinely believe that this patient may very well have difficulty, because of some residual permanent impairment of

---

[1]Under the terms of the Plan, Hackett was not eligible for benefits until ninety days subsequent to the disability onset date.

> her intellectual functions in dealing with a kind of job that she
> has been responsible for.  A less structured and less demanding
> job intellectually, may be more appropriate.  Under the
> circumstances, I have requested a psychological evaluation; and
> hopefully with these recommendations, her insurance company
> will be more amenable to social re-adaptation, in order to find
> her a more suitable position.

A.R. 268.

Based upon Dr. Nabwangu's note, as well as possible cognitive problems and the June 17 hospitalization, Standard reopened her file.  A.R. 282. Standard subsequently found Hackett disabled under the "own occupation" portion of her disability insurance policy on June 23, 2003.  A.R. 290.

As a result of the June 17 hospitalization, Dr. Nabwangu referred Hackett to Dr. John E. Meyers, a clinical neuropsychologist.  A.R. 593-590. On June 21, 2003, Dr. Meyers conducted a battery of tests.  Dr. Meyers found Hackett's verbal IQ to fall within the high average range and her performance IQ to fall within the low average range.  A.R. 592.  Although Dr. Meyers noted that these scores were below her expected range of function, he found that "[t]he difference between her expected performance and her actual performance was not significant."  A.R. 592.

Hackett began seeing neurologist Dr. Steven Hata.  In his note on July 17, 2003, Dr. Hata noted that Hackett had recovered well, but noted that she complained of headaches which she linked to computer usage.  A.R. 388. Dr. Hata noted that Hackett's "neuropsych testing shows performance scores

5

decreased; however, verbal and other scores are normal" and that her cognitive functions were normal.  A.R. 388.  Hackett saw Dr. Hata again in August of 2003, and he noted that Hackett's headaches had decreased to every four days after modification of her medication.  A.R. 389.

In September of 2003, Standard advised Hackett that she may be eligible for social security benefits, and referred her to a firm which assisted with social security applications.  On August 25, 2005, an ALJ found Hackett to be disabled and awarded her benefits.  A.R. 583-84.

Hackett began to see neurologist Dr. Gee in March of 2004.  On March 26, 2004, Hackett reported severe headaches which she stated began two months after the brain hemorrhage.  A.R. 507.  On April 9, 2004, Hackett reported that she suffered a constant headache for the past week, and Dr. Gee instructed her to keep a "headache diary."  AR 504-05.  On May 7, 2004, Dr. Hata noted that Hackett's headaches had improved, that she only suffered a headache once in every three days, and that she only needed to take medication twice in the past month for severe headaches.  A.R. 503.  On July 23, 2004, Dr. Gee noted that Hackett was suffering from frequent headaches, but they were reduced in intensity and only required medication once or less per month.  A.R. 501.  In July of 2004, Hackett was also examined by Dr. Monte S. Dirks, who found that she suffered a 38 percent loss to her total visual system.  A.R. 430.

6

In late 2004, Standard began analyzing Hackett's claims under the "any occupation" provision of the Plan.  Standard provided Hackett's medical records to Dr. Lawrence Zivin, a board certified neurologist and consultant to Standard.  Dr. Zivin reviewed the records and opined that Hackett was able to perform sedentary to light job activity, with accommodations made for her left visual field.  A.R. 517.  Dr. Zivin opined that her cognitive ability was in the normal range.  A.R. 516-17.  In January 2005, Standard sent a claims consultant to interview Hackett.  A.R. 529.  The consultant reported that Hackett was able to drive, speak clearly, and answer questions in a clear and concise manner.  A.R. 531-532.

In June of 2005, Standard ordered a transferable skills assessment.  A vocational case manager (VCM) assessed Hackett's transferrable skills based upon Dr. Zivin's report.  The VCM found that Hackett had the ability to perform full-time sedentary work activities, with a possible vision accommodation, and that there were positions available in her area that constituted gainful employment under the "any occupation" definition of the Plan.  A.R. 545-552.

On August 11, 2005, Standard denied Hackett's application for "any occupation" disability benefits.  In the letter explaining the decision, Standard stated that Hackett's previous position with MPI qualified as "light work" with regard to the amount of physical activity the position entailed.  A.R. 558-61.

7

Standard stated that it had reviewed the reports of Hackett's physicians as well as that of Dr. Zivin, and found that Hackett was incapable of performing light work.  Id.  But Standard found that she was capable of performing "full-time sedentary work with reasonable continuity and accommodation for left visual field compromise."  Id.  Standard stated that the VCM had found positions which Hackett could perform, and therefore she did not qualify for "any employment" benefits.  Id.

Hackett appealed Standard's determination and submitted additional records for Standard to review.  A.R. 583-607.  Standard provided the additional documentation to Dr. Elias Dickerman for an independent medical review.  Dr. Dickerman found that Hackett's difficulty with headaches, though consistent, had reduced in severity.  A.R. 629.  Dr. Dickerman found that actual testing revealed cognitive scores within a normal range.  A.R. 629. Dr. Dickerman concluded that medical evidence did not support specific restrictions on Hackett's occupational abilities.  A.R. 628.

Based on the record, Standard upheld its original decision denying Hackett "any occupation" disability benefits.  The decision stated in part:

> Dr. Bowman's chart note of November 3, 2005 states that Ms. Hackett does continue to experience a headache every two to three days.  Dr. Bowman's chart-note also indicates that Ms. Hackett performs computer work for the business she shares with her husband.  The chart note also indicates that a one year old relative has recently been placed into the custody of Ms. Hackett and her husband and as of the date of that chart note was residing with Ms. Hackett.  Ms. Hackett verified her

8

ability to drive during an in-person interview conducted by
Duane Hennings in January 2005.  Ms. Hackett stated a
preference to avoid nighttime driving due to her vision but did
not confirm any formal restriction to her driving.

A.R. 641.

Standard also acknowledged the social security decision awarding

benefits, but noted that Hackett's claim was evaluated under the terms of the

Plan which differed from those used by the Social Security Administration.

A.R. 640.  Standard noted that the record did not demonstrate Hackett to

have "specific cognitive limitation or mental limitation from the brain

hemorrhage" and further that "Hackett's headaches are under fair control and

do not require significant intervention with medications."  A.R. 640.

Accordingly, Standard upheld its August 11, 2005, decision denying Hackett

"any occupation" benefits.  A.R. 640.

Hackett challenged the appeal, and it was then reviewed by Standard's

Quality Assurance Unit, which issued its findings on April 9, 2006.  The

Quality Assurance Unit upheld Standard's denial of benefits.  A.R. 652-662.

Hackett claims that Standard's determination that she did not qualify

as disabled under the "any occupation" definition was made in error.  She

further argues that Standard's determination is subject to heightened scrutiny

as a result of the circumstances surrounding the denial.  Standard argues

that heightened scrutiny should not apply, but regardless of the standard of

review, Standard asserts the denial was supported by the record.

9

**DISCUSSION**

**I.      Standard of Review**

Pursuant to the general conditions set forth in the Plan, Standard retained "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy."  A.R. 8.  The authority retained by Standard explicitly includes the right to determine "[t]he sufficiency and the amount of information [Standard] may reasonably require to determine" entitlement to benefits.  Id.

In the ERISA arena, when a benefit plan gives a fiduciary discretionary authority to administer a plan, a deferential standard is to be applied by the reviewing court.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989); Barnhart v. UNUM Life Ins. Co. of America, 179 F.3d 583, 587 (8th Cir. 1999) (stating that when a fiduciary is given discretion in an ERISA plan, any decision should be reviewed for an "abuse of discretion").

Hackett does not dispute that the Plan grants Standard discretionary authority, but rather argues that a heightened standard of review should apply because of the conditions surrounding Standard's denial of benefits. "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor

10

in determining whether there is an abuse of discretion." Firestone, 489 U.S. at 115.  In Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998), the Eighth Circuit held that to obtain a less deferential standard of review in the ERISA context, a party must "present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty."  The court in Woo adopted the "sliding scale approach" to determine the appropriate level of deference to give to the ERISA administrator when a conflict of interest exists.  Id. at 1161.  Under that approach, "a reviewing court will always review for an abuse of discretion, but it will decrease the deference given to the administrator in proportion to the seriousness of the conflict of interest or procedural irregularity."  Id. at 1161.

Hackett asserts that a conflict of interest exists, and the first prong of the Woo test is met, because Standard acts as both the insurer and administrator of the Plan.  The Eighth Circuit has recognized that something akin to a rebuttable presumption of a conflict of interest exists when one entity acts as both an insurer and a plan administrator.[2]  See Schatz v. Mut of

---

[2] There is conflicting Eighth Circuit precedent that holds that "simply because the plan administrator is the self-insured provider of benefits," a presumption of conflict does not arise.  Davolt v. Executive Comm. of O'Reilly Auto., 206 F.3d 806, 809 (8th Cir. 2000).  Because there is conflicting circuit precedent, the better practice is to follow the earliest opinion as it should have controlled the subsequent panel that created the conflict.  T.L. ex rel. Ingram v. United States, 443 F.3d 956, 960 (8th Cir. 2006).  Because Barnhart was issued

Omaha Ins. Co., 220 F.3d 944, 948-49 (8th Cir. 2000) (stating that a "rebuttable presumption" of a conflict of interest exists when the insurer and claim administrator are the same entity); but see Davolt v. Executive Comm. of O'Reilly Auto., 206 F.3d 806, 809 (8th Cir. 2000).  See also Barnhart v. UNUM Life Ins. Co., 179 F.3d 583, 587-88 (8th Cir. 1999).  "Indicia of bias can be negated by 'ameliorating circumstances,' such as 'equally compelling long-term business concerns' that militate against improperly denying benefits despite the dual role."  Schatz, 220 F.3d at 947 (quoting Barnhart, 179 F.3d at 588).  Here, Standard has articulated no ameliorating circumstances to overcome this structural bias, such as the insurer being a nonprofit entity, and thus the court concludes that the plan administrator was operating under a palpable conflict of interest that satisfied part one of the Woo two-part test.  Because the court finds that the plan administrator was operating under a palpable conflict of interest, the court need not consider Hackett's alternative contention that there was a serious procedural irregularity.

To meet the second part of the Woo test, Hackett must demonstrate that the "conflict of interest or serious procedural irregularity caused a serious breach of the administrator's fiduciary duty."  Barnhart, 179 F.3d at 583.  In order to demonstrate a serious breach of the administrator's fiduciary duty, "[t]he evidence offered by the claimant must give rise to serious doubts as to

---

before Davolt, this court will follow the holding in Barnhart.

12

whether the result reached was the product of an arbitrary decision or the plan administrator's whim." Tillery v. Hoffman Enclosures Inc., 280 F.3d 1192, 1197 (8th Cir. 2002).

Hackett argues that Standard's conflict of interest and the consulting physicians' incentives to find Hackett not disabled caused an improper denial of benefits to Hackett. The court finds that Hackett has not met her burden under the second part of the Woo test. A review of the record indicates that Standard thoroughly reviewed Hackett's claim in both its initial review and in the two subsequent appeals. A.R. 558-561, 640-641, 652-662. There is no evidence to suggest that any potential funding conflict of interest caused a serious breach of a fiduciary duty. See Woo, 144 F.3d at 1161-62 (holding that the claimant must show that the conflict or irregularity has "some connection to the substantive decision reached"). There is also no evidence that Dr. Zivin and Dr. Dickerman had any financial incentives to find Hackett not disabled or that they denied a disproportionate share of the claims that they reviewed for Standard. See, e.g., Armstrong v. Aetna Life Ins. Co., 128 F.3d 1263, 1265 (8th Cir. 1997) (employing a heightened standard of review when claims reviewers received a "claims savings" bonus for denial of claims). Additionally, there is no evidence that Dr. Zivin's or Dr. Dickerman's

13

relationship with Standard resulted in a breach of the administrator's fiduciary duty.[3]

Furthermore, the court does not find any alleged errors in the reports of the consulting physicians to be material. The reports therefore can be relied upon by Standard in determining Hackett's eligibility for benefits. Finally, although Standard considered the opinions of the consultants, Standard did not rely solely upon the consulting physicians in its initial denial of "any occupation" benefits, and its subsequent decision upholding that denial.

Although Hackett met the first prong of the <u>Woo</u> test, Hackett failed to present "material, probative evidence" to demonstrate that any conflict of interest or procedural irregularity was sufficient to give rise to "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." <u>See</u> <u>Tillery</u>, 280 F.3d at 1197. Pursuant to Eighth Circuit precedent, Hackett has not made a sufficient showing under <u>Woo</u> to obtain a less deferential review of Standard's denial of benefits. Accordingly, this court will review Standard's determination for an abuse of discretion.

---

[3]The court notes that the Plan Administrator, not the consulting physicians, is whom Hackett must show acted in violation of its fiduciary duty in order to obtain a heightened standard of review. <u>See</u> <u>Weidner v. Federal Express Corp.</u>, No. 06-32522 at 7 (8th Cir. 2007) (noting that an action by an entity that was not in a "fiduciary decisionmaking capacity" does not provide evidence of a "conflict that caused a serious breach of a plan administrator's fiduciary duty").

## II.      Denial of Benefits

When reviewing Standard's decision to deny benefits for an abuse of discretion, the court must uphold the decision "if a reasonable person could have reached a similar decision." Woo, 144 F.3d at 1162.  "Review of an administrator's decision under an abuse of discretion standard, though deferential, is not tantamount to rubber-stamping the result.  On the contrary, we review the decision for reasonableness, which requires that it be supported by substantial evidence that is assessed by its quantity and quality." Torres v. UNUM Life Ins. Co. of Am., 405 F.3d 670, 680 (8th Cir. 2005).

### A.      Previous Grant of Benefits

Hackett argues that Standard's determination that Hackett could not perform her "own occupation" prevents Standard from arguing that she is not eligible for benefits under the "any occupation" portion of her policy.  "In the absence of a significant change in plaintiff's condition, an insurer's previous payment of benefits weighs against the propriety of termination of benefits." Dillard's v. Liberty Life, 456 F.3d 894, 900 (8th Cir. 2006).

It is undisputed that Hackett's "any occupation" claim was evaluated under a different standard than her "own occupation" claim.  But in deciding to deny benefits to Hackett under the "any occupation" definition, Standard in part relied upon its finding that Hackett was unable to perform at a work level

15

above sedentary.  Standard determined that Hackett's position at MPI required "light work" and therefore in part differentiated her "own occupation" and "any occupation" claims on that basis.  In response to Standard's initial denial of her "any occupation" claim, Hackett submitted an affidavit that stated that her work at MPI was not greater than sedentary.  A.R. 606. Hackett argues that "because Standard found that Hackett could not return to the prior work, if that prior work was sedentary, then she is unable to do sedentary work now."  Docket 55 at 8.

In response, Standard asserts that it did not focus on Hackett's ability to perform "light" versus "sedentary" work in making its benefits determinations.  Standard asserts that although the VCM at one point identified Hackett's inability to perform light work as the basis for her "own occupation" benefits, that portion was made in error, and the VCM accurately described Hackett's limitations in other portions of the report.  Docket 53 at 14.

The court finds that Standard's grant of "own occupation" benefits does not weigh against Standard's determination that Hackett is not eligible for "any occupation" benefits.  From the record, it appears Standard appropriately considered factors other than Hackett's ability to do "light work" in granting her short term disability claim.  The "own occupation" claim was reopened based upon the submission of evidence of possible "intellectual

16

impairment" in conjunction with Hackett's other alleged disabilities and her recent hospitalization. These bases for disability were more thoroughly evaluated after the grant of Hackett's "own occupation" claim, and the evaluations were used to support Standard's denial of Hackett's "any occupation" claim. Throughout its administration of Hackett's "any occupation" claim, Standard analyzed a number of grounds other than Hackett's physical work capacity, upon which it determined her ineligible for "any occupation" benefits.

Further, the court does not believe that the alleged error in analyzing the physical requirements of Hackett's position at MPI forecloses Standard from later finding that she is capable of obtaining sedentary employment at a different position. If, as alleged by Hackett, Standard found that Hackett's position at MPI was more strenuous than it actually was, that determination was beneficial to Hackett when Standard determined her eligibility for "own occupation" benefits. But that determination does not preclude Standard from later finding her capable of working in positions that it correctly determines to be sedentary.

### B.    Impairments

Hackett argues that when Standard determined her ineligible for "any occupation" benefits, Standard failed to consider all of her impairments: her headaches, vision loss, fatigue, inability to operate computers, and cognitive

problems.  Hackett asserts that her headache log and personal affidavit demonstrate debilitating headaches, which Standard inadequately considered. In Dr. Zivin's report, he noted that Hackett reported difficulty with headaches, but found that the condition had improved as evidenced by her infrequent need for medication.  In Standard's initial review of its decision denying benefits, the administrator stated: "[t]he information provided does not support that Ms. Hackett's [sic] has experienced headaches of severe intensity requiring emergency treatment.  [Dr. Dickerman] stated that Ms. Hackett's headaches are under fair control and do not require significant intervention with medication."  A review of the relevant medical records indicates that while Hackett reported to her treating physicians that she was suffering from headaches, she also showed steady improvement.  A review of Dr. Gee's most recent medical records demonstrates that although Hackett did consistently complain of headaches during the first half of 2004, her headaches consistently improved.  As of July 23, 2004, Dr. Gee noted that Hackett's headaches were reduced in intensity, and only once a month required medication to control them.

Hackett similarly argues that Standard granted insufficient weight to her claims of fatigue and inability to work with a computer.  In its review of the denial decision, Standard addressed these alleged disabilities.  A.R. 654. Although at times Hackett reported fatigue, Dr. Bowman's medical records

indicate that medication resulted in an increased energy level.  Further, although Hackett at times reported that she believed her headaches resulted from computer usage, her treating physicians did not opine that she is unable to use a computer.

Hackett further argues that Standard insufficiently considered her vision loss.  Hackett suffered peripheral vision loss and this limitation was explicitly incorporated by the VCM.  But Hackett continues to drive, which supports Standard's position that although she has vision loss, that loss is not entirely disabling.

Finally, Hackett asserts that Standard failed to properly consider evidence that she has decreased motor, sensory, and auditory processing skills, as well as attention, concentration, and emotional problems.  In its review of the denial, Standard explicitly discussed the testing performed by Dr. Meyers and noted that Hackett generally scored within the normal range.  A.R. 659.  This is consistent with Dr. Dickerman's review of Hackett's records, as well as the opinion of Dr. Meyers who found that "[t]he difference between [Hackett's] expected performance and her actual performance was not significant."

The court finds that Standard sufficiently reviewed Hackett's alleged disabilities.  Further, these disabilities were taken into account by Standard's

19

consulting physicians and the VCM. As noted in <u>Hollrah v. UNUM Provident Corp.</u>, No. 02-3751 (D. Minn. July 21, 2003) (unpublished):

> The fact that [the claimant] was experiencing symptoms, however, does not mean that she was disabled. Instead, disability hinges on whether the illness, as it manifests itself, necessitates the imposition of restrictions and limitations.

In this case, although the court has no doubt that Hackett at times experiences the symptoms she alleges, there is substantial evidence in the record that supports Standard's finding that these symptom do not render her disabled for any occupation. Significantly, Hackett's treating physicians do not opine that she is disabled for any occupation. Pursuant to the terms of the Plan, Standard has the discretion to determine the sufficiency of proof required to determine entitlement to benefits. After reviewing the record, the court finds that Standard did not abuse its discretion in finding that Standard's allegations of impairments were insufficient to demonstrate she was disabled under the "any occupation" portion of the Plan.

### C.    Social Security Application

Hackett also argues that Standard's role in assisting her in obtaining Social Security benefits provides further support for her argument that Standard's denial of benefits is unreasonable. It is undisputed that while Hackett was receiving "own occupation" benefits, Standard assisted her in applying for and receiving social security disability benefits. Pursuant to the terms of the Plan, Hackett was required to pursue Social Security benefits and

other income for which she was eligible.  A.R. 11.  Standard considered the Social Security Administration decision, but did not find it controlling under the terms of the Plan.

Hackett cites the Seventh Circuit opinion of <u>Ladd v. ITT Corp.</u>, 148 F.3d 753 (7th Cir. 1998), as support for her argument that Standard should not be allowed to on one hand support her application for disability benefits, and then subsequently find her not disabled.  In <u>Ladd</u>, the court noted that the insurer's advocacy on behalf of the claimant in front of the Social Security Administration "casts additional doubt on the adequacy [of the insurer's claim evaluation], even if it does not provide an independent basis for rejecting that evaluation."  <u>Id.</u> at 756.  The court held that the doctrine of judicial estoppel, though technically not applicable, provided support for the argument that if an insurance company is successful in obtaining social security benefits for its client, it should not subsequently deny disability benefits.  <u>Id.</u>

The rationale of <u>Ladd</u> has never been adopted in the Eighth Circuit.  In fact, the Eighth Circuit has specifically held that the SSA determination is not binding in a claim for long-term disability benefits under ERISA.  <u>Riedl v. Gen. Am. Life Ins. Co.</u>, 248 F.3d 753, 759 (8th Cir. 2001).  <u>See also</u> <u>Farfalla v. Mut. of Omaha Ins. Co.</u>, 324 F.3d 971 (8th Cir. 2003).  In this case, Standard had already approved and was paying Hackett "own occupation" benefits when Standard encouraged and assisted her in the application process for social

21

security benefits.  The court does not find that Standard's request that Hackett seek social security benefits, as she was contractually obligated to do, supports Hackett's assertion that Standard's denial of benefits was unreasonable.

## CONCLUSION

A review of the administrative record in this case demonstrates that there is sufficient evidence for a reasonable administrator to determine that Hackett was not disabled from "any occupation" as defined in her policy.  The court therefore cannot disturb Standard's determination.  Accordingly, it is hereby

ORDERED that Standard's motion for summary judgment (Docket 26) is granted.

IT IS FURTHER ORDERED that Hackett's motion for summary judgment (Docket 41) is denied.

Dated August 15, 2007.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE