UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN M. HACKETT, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. 06-5040 |
| | ) | |
| v. | ) | |
| | ) | |
| STANDARD INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S RESPONSE TO
DEFENDANT'S OBJECTION TO JUDGE DUFFY'S DISCOVERY ORDER

TABLE OF CONTENTS

I. Case Background — 1

II. The Standard of Review Which Applies to Standard's Objection to Judge Duffy's Order is Clearly Erroneous or Contrary to Law — 3

III. Judge Duffy Did Not "Ignor[e] the Posture of the Case" — 3

IV. Judge Duffy Was Not Clearly Erroneous in Finding that the Requested Discovery is Not Cumulative and Irrelevant — 5

V. Judge Duffy Was Not Clearly Erroneous in Finding that the Burden of the Requested Discovery Does Not Outweigh Its Potential Benefit to Hackett — 10

    A. Weighing the Burden of Discovery Against its Potential Benefit is a Factual Matter, so the Clearly Erroneous Standard Applies — 10

    B. Standard Improperly Relies on New Factual Materials Not Presented to Judge Duffy — 11

    C. If this Court Considers Standard's Argument on its Merits, Standard Should Lose — 13

    D. Conclusion as to Standard's Undue Burden Argument — 17

VI. Conclusion — 18

I.  Case Background

Kathleen Hackett was a Customer Service Supervisor at Mileage Plus Inc. (MPI) in Rapid City for 14 years.[1] Although she has only a high school education, her earnings rose to $47,366 per year.[2] In September, 2002, she had a brain hemorrhage, and underwent emergency surgery to save her life. Eleven days after surgery, she was discharged home.[3]

On November 6, 2002, she attempted to return to work part-time at MPI.[4] Her employer accommodated her limitations, but her work attempt ended in May, 2003.[5] Shortly afterwards, she tried two part-time jobs, but was unable to perform either successfully.[6] The Social Security Administration found her disabled.[7]

Hackett applied for disability benefits under a disability insurance policy issued by Standard Insurance Company. Eventually Standard accepted her claim for benefits under the "own occupation" policy provision effective for the first two years of disability. After

---

[1] STND 924-00200. This citation and all similar citations refer to the Bates stamp numbers on the materials contained in doc. 35. This filing was made by Standard. On some of these documents, the date on the document was redacted by Standard.

[2] STND 924-00537 (high school education) and STND924-00174 (salary stated as $3,947.17 per month which is $47,366.04 per year).

[3] STND 924-00245.

[4] STND 924-00202.

[5] STND 924-00307.

[6] STND 924-00605.

[7] STND 924-00583 to 588.

1

the first two years, the policy definition of disability changed to "any occupation," and Standard found her not eligible for further benefits. Under the "any occupation" provision, Hackett is entitled to disability benefits unless she can earn at least $2,600 per month, which is equivalent to $31,200 per year.[8]

Hackett sued Standard under the Employment Retirement and Income Security Act (ERISA), seeking disability benefits under the policy. Both sides eventually moved for summary judgment. Relying on the law in effect prior to *Metropolitan Life Insurance Company v. Glenn*, 128 S. Ct. 2343 (2008), Judge Schreier granted summary judgment for Standard. Doc. 56. Hackett appealed, arguing that Judge Schreier had erred. While the appeal was pending, the United States Supreme Court decided *Metropolitan Life Insurance Co. v. Glenn*. Standard argued that Judge Schreier's decision should be affirmed despite *Glenn*, but the Eighth Circuit disagreed, reversing based on *Glenn* and remanding the case for reconsideration in light of *Glenn*. *Hackett v. Standard Insurance Company*, 559 F.3d 825 (8th Cir. 2009).

Less than a month after the Eighth Circuit's ruling, and before the Eighth Circuit had even issued its mandate returning the case to this Court, Hackett served twelve interrogatories and requests for production on Standard. Standard refused to answer any of them. Hackett moved to compel. Judge Schreier referred the motion to Judge Duffy, who

---

[8]STND924-00551 ("Per the Benefits Analyst, the wage consideration is $2600 per month (approximately $15.02 per hour) or greater.")

granted the motion as to ten of the requests and denied it as to two of them. Doc. 74. Standard filed an objection to Judge Duffy's order. Doc. 77. Standard's objection is now before this Court for resolution.

II.  The Standard of Review Which Applies to Standard's Objection to Judge Duffy's Order is Clearly Erroneous or Contrary to Law

The standard of review this Court applies in reviewing a discovery order is whether it is clearly erroneous or contrary to law. F. R. Civ. P. 72(a); *Soliman v. Johanns*, 412 F.3d 920, 923 (8th Cir. 2005). In an attempt to escape the clearly erroneous barrier and obtain *de novo* review, Standard claims that Judge Duffy committed legal error. Standard's first two arguments (sections III. and IV. below) contain both issues of law and issues of fact. Standard's third argument (section V. below) is purely factual.

"A finding is clearly erroneous only when the reviewing court has the definite and firm conviction that a mistake has been committed upon consideration of the entire record. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Nash Finch Co. v. Rubloff Hastings, L.L.C.*, 341 F.3d 846, 850 (8th Cir. 2003) (internal quotations omitted). *Accord*, *Little Rock Sch. Dist. v. Armstrong*, 359 F.3d 957, 964 (8th Cir. 2004).

III.  Judge Duffy Did Not "Ignor[e] the Posture of the Case"

Standard claims that Judge Duffy "ignored the posture of the case in ordering discovery." The parties briefed plaintiff's motion to compel. Hackett filed an initial brief (doc. 70); Standard filed a memorandum opposing the motion (doc. 71); and Hackett filed

a reply brief (doc. 73). All three briefs addressed the posture of the case, including Standard's contention that discovery was closed. Doc. 70 p. 3-12; doc. 71 p. 1; and doc. 73 p. 1-6. Judge Duffy specifically addressed the post-*Glenn* posture of the case. Doc. 74 p. 3-4 and 8-18. *Glenn* is the thread that runs throughout Judge Duffy's opinion. Judge Duffy ruled: "*Glenn* permits limited discovery." Doc. 74 p. 12. She ruled: "It would be illogical to place the new *Glenn* analysis into issue and concomitantly deny Ms. Hackett the opportunity to explore, through her discovery requests, information explicitly illustrated by the Supreme Court as a suitable method of weighing a conflict of interest in a discretionary benefits decision case." Doc. 74 p. 14.

Judge Schreier also disagreed with Standard's contention that no discovery was allowed after remand: on September 21, 2009, she entered an order providing that discovery would remain open until November 17, 2009. Doc. 75. Standard did not object to this order, or move to set it aside, so it controls unless and until modified. F. R. Civ. P. 16(b)(4). Standard asks this Court to ignore Judge Schreier's order.

Standard asserts that it "was given little opportunity to address the merits of the broad discovery Plaintiff served." Doc. 77 p. 3. Standard's assertion is completely untrue. Standard had a full opportunity in its brief (doc. 71) to address everything it wanted to address. Judge Duffy described Hackett's discovery requests as "limited discovery requests which go to the heart of the conflict of interest issue." Doc. 74 p. 13.

IV. Judge Duffy Was Not Clearly Erroneous in Finding that the Requested Discovery is Not Cumulative and Irrelevant

Standard argues that *Glenn* does not make discovery appropriate, because a conflict of interest is presumed and discovery cannot affect this one way or the other. Standard is incorrect. Many courts have ruled that *Glenn* allows discovery. Judge Duffy's order, p. 10-11, lists some of them. Other cases from this circuit allowing discovery include *Winterbauer v. Life Ins. Co. of North America*, 2008 U. S. Dist. Lexis 83712 * 15 (E. D. Mo.) ("[i]n this case, the court believes *Glenn* permits some amount of discovery") and *Elder v. Life Ins. Co. of North America*, 2009 U. S. Dist. Lexis 10033 * 9 (E. D. Mo.) ("*Glenn* makes clear . . . that a conflict or procedural irregularity cannot be considered in a vacuum. Discovery is required to explore the nature and extent of the purported conflict or irregularity at issue.")

Standard says that discovery is unnecessary because "this Court's task on remand . . . is limited to considering the presumed conflict as a factor in evaluating the decision to discontinue payment of disability benefits." Doc. 77 p. 5. But the Eighth Circuit says otherwise: "under this Court's pre-*Glenn* precedent, a financial conflict of interest would not trigger less-deferential review unless the claimant could show that the conflict was causally connected to the specific decision at issue. [citation omitted] *Glenn* makes clear that, while a causal connection might be important in determining the appropriate level of scrutiny for a plan administrator's decisionmaking, such a connection is not required." *Chronister v. Unum Life Ins. Co.*, 563 F.3d 773, 775 (8th Cir. 2009).

Standard argues that interrogatories 9 through 12, which relate to Standard's

5

consulting physicians Dr. Zivin and Dr. Dickerman, "are irrelevant as they relate to general benefit decision-making or unrelated claim decisions." Judge Duffy saw it otherwise, finding as a fact that these requests "will be helpful to the district court in determining the extent of the conflict on [sic] interest inherent in Standard's dual roles as plan administrator and payor of benefits, and in determining the amount of deference to be given to Standard's denial of benefits." Doc. 74 p. 18.

Dr. Zivin and Dr. Dickerman never saw Ms. Hackett, but gave Standard opinions that she could work, which Standard used to deny Hackett's claim. In the very limited discovery Judge Schreier permitted pre-*Glenn*, plaintiff learned that Standard paid Dr. Dickerman, who is not an employee but a consultant, $*577,000* from 2003 to 2005, and paid Dr. Zivin, also not an employee but a consultant, $*115,228* during the same period. Doc. 46 p. 13 and 21. Reasonable people believe that consultants who receive so much money from an insurance company may tell the insurance company what it wants to hear in order to keep their income flowing, and the law agrees: "[P]hysicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and preserve their own consulting arrangements." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (internal quotations omitted).

In denying Hackett's claim under pre-*Glenn* law, Judge Schreier ruled that despite these substantial payments, there is "no evidence that Dr. Zivin and Dr. Dickerman had any financial incentives to find Hackett not disabled or that they denied a disproportionate share

6

of the claims that they reviewed for Standard." Doc. 56 p. 13.  Interrogatories 9 through 12 are plaintiff's attempt to remedy the lack of evidence perceived by Judge Schreier.  These interrogatories ask:

> 9. From 2003 to 2005, how many times did Dr. Zivin provide an opinion supporting denial of disability benefits under the "any occupation" standard?
>
> 10. From 2003 to 2005, how many times did Dr. Zivin provide an opinion supporting allowance of disability benefits under the "any occupation" standard?
>
> 11. From 2003 to 2005, how many times did Dr. Dickerman provide an opinion supporting denial of disability benefits under the "any occupation" standard?
>
> 12. From 2003 to 2005, how many times did Dr. Dickerman provide an opinion supporting allowance of disability benefits under the "any occupation" standard?

The answers to these interrogatories may help fill the gap that Judge Schreier perceived.  Standard will respond that the numbers alone can't answer this question.  But the meaning of the numbers cannot be addressed until plaintiff has the numbers, and it allowed to consider potential followup discovery.  Even though Standard now claims the information is irrelevant, Judge Schreier did not think it irrelevant when she cited the lack of such information as a ground for ruling against Hackett.

Standard says the information sought is "proprietary and confidential," but does not explain how this is so, or how disclosure could unfairly damage its competitive position.

Standard cites no authority and provides no sworn statements in support of its claim. The burden to justify such a claim is on Standard, and it has failed to meet this burden. "The party requesting a protective order must initially show that the information sought to be protected is within the scope of Rule 26(c) and that he might be harmed by its disclosure. 8 C. Wright & Miller, Federal Practice and Procedure, § 2043 at 300-01 (1970)." *Iowa Beef Processors, Inc. v. Bagley*, 601 F.2d 949, 954 n.5 (8th Cir. 1979).

"[A] litigant generally may make whatever use it wishes of information obtained through discovery. . . . The risk--or in this case, the certainty--that the party receiving the discovery will share it with others does not alone constitute good cause for a protective order." *Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. 539, 545-46 (N.D. Ind. 1991).

Standard coordinates its defense of all the cases filed against it. Sharing of information allows plaintiffs to find the truth, and to coordinate their cases, thereby saving litigants and the court time and money. The legal system is often criticized for being too costly and too slow. Shared discovery allows the process to move faster and cost less. "The plaintiffs' attorneys' discovery information exchange group reduces the effort and expense inflicted on all parties, including Ford, by repetitive and unnecessary discovery. In this era of ever expanding litigation expense, any means of minimizing discovery costs improves the accessability and economy of justice. . . . Each plaintiff should not have to undertake to discover anew the basic evidence that other plaintiffs have uncovered. To so require would be tantamount to holding that each litigant who wishes to ride a taxi to court must undertake

the expense of inventing the wheel. Efficient administration of justice requires that courts encourage, not hamstring, information exchanges such as that here involved." *Ward v. Ford Motor Co.*, 93 F.R.D. 579, 580 (D. Colo. 1982).

Standard wants the cost of litigation to be high, because the higher the cost of litigation, the fewer attorneys can afford to litigate against it, no matter how bad its misconduct. The Federal Rules of Civil Procedure are intended to reduce the cost of litigation, not increase it; they "shall be construed to secure the just, speedy and inexpensive determination of every action." F. R. Civ. P. 1. Using discovery material obtained in one case in other cases furthers this purpose. It avoids wasting judicial time as judge after judge considers the same issues.

"[I]t is at least theoretically advantageous to the attorneys for plaintiffs in the various suits to share the fruits of discovery. They thus reduce the time and money which must be expended to prepare for trial and are probably able to provide more effective, speedy and efficient representation to their clients. [citation omitted] If this approach leads to the consolidation of cases, it will save judicial time and effort as well. On its face, such collaboration comes squarely within the aims laid out in the first and fundamental rule of the Federal Rules of Civil Procedure: 'These rules . . . . shall be construed to secure the just, speedy and inexpensive determination of every action.' [citation omitted] Thus, there is no merit to the all-encompassing contention that the fruits of discovery in one case are to be used in that case only." *Williams v. Johnson & Johnson*, 50 F.R.D. 31, 32 (S. D. N. Y.

9

1970).

F. R. Civ. P. 26(c)(1)(g) requires a showing of "good cause" before discovery is limited based on a claim of "trade secret" or anything else. In determining "good cause" with respect to an alleged trade secret, the party opposing discovery first must show that the information is a trade secret, at which point the burden shifts to the party seeking discovery to show that the information is relevant and needed. *In Re: Remington Arms Company*, 952 F.2d 1029, 1032 (8th Cir. 1991). In making this showing, the moving party has the burden "to show the necessity of its issuance, which contemplates 'a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements . . . .' Wright & Miller, Federal Practice and Procedure: Civil § 2035 at 264-65." *General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973). Standard has completely failed to make the required showing.

V. Judge Duffy Was Not Clearly Erroneous in Finding that the Burden of the Requested Discovery Does Not Outweigh Its Potential Benefit to Hackett

   A. Weighing the Burden of Discovery Against its Potential Benefit is a Factual Matter, so the Clearly Erroneous Standard Applies

Whether discovery is unduly burdensome is a factual matter, so the clearly erroneous standard applies, not the error of law standard. This Court may reverse only if it "is left with a definite and firm conviction" that Judge Duffy made a mistake based on the record before her. "A magistrate's determination in a discovery dispute is entitled to great deference and reversible only for an abuse of discretion." *Dome Petroleum v. Employers Mut. Liab. Ins.*

10

*Co.*, 131 F.R.D. 63, 65 (D. N. J. 1990).

> B. <u>Standard Improperly Relies on New Factual Materials Not Presented to Judge Duffy</u>

Standard's argument relies *entirely* on new factual materials (the Declarations of Walter Borden, Jr. and Alison Daily) not presented to Judge Duffy. For three reasons, these materials should not be considered by this Court in ruling on Standard's appeal from her order.

First, the law says that new materials not presented to Judge Duffy may not be considered. This is the same as in any appeal: new materials may not be submitted on appeal that were not submitted to the judge who made the original decision. Systemic efficiencies would be frustrated and the magistrate's role reduced to that of a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round. In addition, it would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and -- having received an unfavorable recommendation -- shift gears before the district judge. Cf. *James v. Watt*, 716 F.2d 71, 78 (1st Cir. 1983), cert. denied, 467 U.S. 1209, 104 S. Ct. 2397, 81 L. Ed. 2d 354 (1984) (allowing amendment asserting new theory after district court dismissal 'would allow plaintiffs to pursue a case to judgment and then, if they lose, to reopen the case . . . to take account of the court's decision . . . a practice [which] . . . should not be sanctioned in the absence of compelling circumstances'). Such a fast shuffling of the orderly processes of federal litigation should not be encouraged."

*Paterson-Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988).

Many other cases say the same thing, although not quite so colorfully. "[A]rguments or available evidence not raised before the magistrate-judge are deemed waived." *Corujo-Marti v. Triple-S, Inc.*, 519 F. Supp. 2d 201, 204 (D. Puerto Rico 2007). "Issues raised for first time in objections to magistrate judge's recommendation are deemed waived." *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996). This rule binds this Court: "[B]ecause in fulfilling the statutory 'clearly erroneous' review function in reviewing the facts found by the magistrate judge, the district court here considered portions of the record in *Cipollone* that were not in the record before the magistrate judge, its determination that the magistrate judge's findings of fact were clearly erroneous cannot stand. By statute, the district court was not allocated the competence to do more than perform the clearly erroneous review function." *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 93 (3d. Cir. 1992).

Second, if this Court allows new factual materials to be submitted after Judge Duffy rules, no litigant need take her seriously. Any litigant will be free to sandbag Judge Duffy, knowing that this Court will allow it to submit new materials and make its case anew if it does not prevail before her. The whole point of having a Magistrate Judge decide discovery disputes will be lost.

Third, F. R. Civ. P. 1 requires that the rules of civil procedure "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action and

proceeding." If the district court allows a litigant to submit new factual materials that it did not submit to Judge Duffy, the entire system will move much more slowly, because the district court will always be conducting *de novo* reviews, based on new evidence not presented to Judge Duffy, instead of merely determining whether Judge Duffy's rulings are clearly erroneous or based on legal error.

      C.      <u>If this Court Considers Standard's Argument on Its Merits, Standard Should Lose</u>

Standard at p. 7 of its brief relies on pre-*Glenn* cases which say that ERISA proceedings should be limited. As plaintiff discussed in the briefs submitted to Judge Duffy, and as the Eighth Circuit's decision in this case proves, *Glenn* changed the law of ERISA review. "There is no doubt that *Glenn* changed ERISA review in some ways." *Chronister v. Unum Life Ins. Co.*, 563 F.3d 773, 775 (8th Cir. 2009). Pre-*Glenn* ERISA cases are no longer good law to the extent that they conflict with *Glenn*. *Glenn* expressly holds that Congress' intention to protect employee benefits outweighs the benefit of any special procedural limitations in ERISA cases. *Glenn*, 128 S. Ct. at 2349.

The burden to make an adequate factual showing in support of its position rests on Standard. The factual showing must be based on a sworn statement, so unsworn assertions of counsel are disregarded. Standard submits the declarations of Walter Borden, Jr., and Alison Daily. Mr. Borden's declaration claims that the process of reviewing the employee files of some 200+ employees who have made claim decisions since the year 2000 to determine whether any have been penalized for inaccurate decisionmaking (discovery

requests 3 to 6) could take "weeks." Plaintiff disagrees. Standard has a number of easier options to gather this information:

- Standard could ask its claim supervisors whether they have penalized any employee since 2000 for making inaccurate decisions, and if so, who. Probably few if any penalties were imposed, in light of Mr. Borden's assertion that "appropriate disciplinary action" would only be taken in "[t]he case of repeated errors or deliberate misconduct." Doc. 77-3 p. 3. Since few were taken, supervisors are likely to remember any that occurred.

- Borden says that records of disciplinary action "are maintained in individual personnel files." Doc. 77-3 p. 9. How long could it take to review 200+ personnel files for this information? If it takes ten minutes per file, that would be about 2000+ minutes, which is about 33 hours. A contract employee at $15 per hour could do this work for $500, which is vastly less than what it is costing Standard to oppose Hackett's request for discovery.

- Plaintiff will receive the files, and do the searching at no cost to Standard. This eliminates any possible undue burden on Standard. *McElgunn v. CUNA*, Civ. 06-5061-KES (D.S.D., W. Div.), doc. 204 p. 9 (April 8, 2008) (court overruled defendants' burdensomeness

14

>objection in part because "plaintiff has offered to appear at any designated location to inspect the documents so as to alleviate defendants of the time and expense of scanning and copying all the requested documents.")

With respect to discovery requests 9 through 12, which relate to Drs. Dickerman and Zivin, Standard's Alison Daily asserts that the first step would be to collect all the files, but this is not so; the analysis need not be conducted centrally. If the files are scattered around the country, the analysis could be conducted in the several locations around the country where Standard conducts its business and maintains its files.

Standard says this would take 30 minutes per file for 2,337 files, but Standard's assertion is inconsistent with its prior representations about these files. On February 22, 2007, after plaintiff won a motion to compel discovery, Standard's Second Amended Answers to Plaintiff's First Set of Interrogatories–signed by the same Ms. Daily–disclosed the number of "file reviews" by Dr. Dickerman and Dr. Zivin. Standard, through Ms. Daily, said: "Standard does not track the number of 'cases' reviewed by physician consultants. Rather, Standard tracks the number of reviews performed by physician consultants. Accordingly, each time a physician reviews a file it is counted separately. Subsequent reviews of a claim file may involve only the review of a single new medical record. In addition, physicians are often asked to opine on a single narrow issue or to comment on a single medical record." (Copy attached as Exhibit 1.)

Ms. Daily's 2007 discovery response contradicts her 2009 affidavit that "2,337 claim files" (doc. 77-4 page 2 paragraph 8) are involved.  According to Ms. Daily's 2007 discovery response, far fewer than 2,337 files are involved, because "each time a physician reviews a file it is counted separately."  Thus at issue are far fewer than 2,337 files.  How many fewer?  No one knows.  What we do know is that Ms. Daily and Standard lack credibility, having represented one set of facts in 2007 to serve their purposes then, and a different set of facts in 2009 to serve their purposes now.  To avoid any possible unfair burden to Standard, plaintiff makes the same offer made above: Plaintiff will receive the files, and do the searching at no cost to Standard.

Standard's final argument is based on *Dilley v. Metropolitan Life Ins. Co.*, 256 F.R.D. 643 (N. D. Cal. 2009), which refused to grant discovery of other claims files on the ground that none of those files would be before the court, so that any information on defendant's action in other claims would be irrelevant.  Standard did not make this argument to Judge Duffy, nor did it cite *Dilley* to Judge Duffy, so it waived this argument, in accordance with the authorities cited in Section V. B. above.

Even if Standard's argument is considered on the merits, Standard should lose. *Whalen v. Standard Insurance Company*, 2009 U. S. Dist. Lexis 47812 (C. D. Cal.), a more recent case than *Dilley*, allowed discovery against *Standard Insurance Company* of reports of Standard's physician consultants in 50 cases.  (The plaintiff in *Whalen* took a different approach to discovery than Hackett took, by requesting actual reports of physician

consultants rather than the number of their opinions supporting allowance or denial of disability.) *Whalen* explicitly refuses to follow *Dilley*, and properly so, rejecting every argument advanced by Standard. In addition, *Whalen* found that the consulting physician reports are available electronically, which raises some doubt about Standard's alleged difficulties in reviewing and producing paper files. (Standard also had no difficulty in producing the total number of file reviews by Dr. Dickerman and Dr. Zivin from 2003 to 2005, a number it must have determined electronically. Exhibit 1 p. 3.)

The data sought by Hackett is potentially relevant in several ways. It may show that Drs. Dickerman and Zivin "denied a disproportionate share of the claims that they reviewed for Standard"–the showing that Judge Schreier ruled that Hackett previously failed to make. Doc. 56 p. 13. It may lead to a followup request from Hackett for additional discovery, for example, actual case reports as ordered disclosed in *Whalen*. The possibility that such case reports may be requested may be an incentive to Standard to be honest in its responses to interrogatories 9 to 12. Until the data is produced, it is hard to predict where it may lead.

    D.    <u>Conclusion as to Standard's Undue Burden Argument</u>

Standard has failed to make a credible showing of undue burden, and no showing that Judge Duffy's ruling is clearly erroneous. The Court need not, and should not, reach the merits of this dispute, because Standard submitted *none* of the factual materials to Judge Duffy on which its burdensomeness claim rests; its submission of those materials now violates the fundamental rule that a party may not rely on factual materials on appeal which

17

it did not submit to the judge below. Allowing Standard to overcome Judge Duffy's ruling based on factual materials that Standard did not present to Judge Duffy will send a message to the bar that it need not take Judge Duffy seriously because it can always submit new factual materials to the Court for another bite at the apple if Judge Duffy rules against it. Such a message would promote judicial inefficiency, unnecessarily consume this Court's valuable time, and promote disrespect for Judge Duffy.

VI.  Conclusion

Standard has failed to show that Judge Duffy's discovery order is clearly erroneous or contrary to law. Standard's objection should be overruled.

Dated: October 15, 2009                Respectfully submitted,

/s/ James D. Leach

JAMES D. LEACH
Attorney at Law
1617 Sheridan Lake Rd.
Rapid City, SD 57702
Tel: (605) 341-4400
Fax: (605) 341-0716
jim@southdakotajustice.com
Attorney for Kathleen M. Hackett

Certificate of Service

I certify that on this 15th day of October, 2009, I served this document on defendant by filing it electronically with the clerk of court, thereby causing it to be automatically transmitted electronically to defendant's attorneys.

/s/ James D. Leach

JAMES D. LEACH

18